## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. ELH-19-0160** |
| **DEMETRIOS STAVRAKIS,** | |
| **Defendant.** | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE CONVICTION AND SENTENCE

The United States of America hereby submits the following Response in Opposition to Demetrios Stavrakis' Motion Pursuant to 28 U.S.C. § 2255. For the reasons that follow, the Motion should be denied.

### PROCEDURAL BACKGROUND

On June 6, 2019, a federal grand jury indicted the defendant for (1) use of fire to commit a federal felony, i.e. wire fraud, in violation of 18 U.S.C. § 844(h)(1) (Count One); (2) wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two and Three); and (4) malicious destruction of real property by fire, in violation of 18 U.S.C. § 844(i) (Count Four), as well as aiding and abetting as to each count, in violation of 18 U.S.C. § 2.

A seven-week jury trial commenced on September 9, 2019. At the close of the government's case on October 15, 2019, the defendant filed a motion for judgment of acquittal (JA 1743-53), and on October 17, 2019, the government filed a written response. JA 1926-40.[1] The district court reserved ruling on the motion until the conclusion of the case.

---

[1] References to the Joint Appendix will be cited as "JA" followed by the page number. References to the Supplemental Joint Appendix will be cited as "SJA" followed by the page number

After the district court instructed the jury, deliberations began on the afternoon of October 23, 2019.  JA 2362.  After deliberating just two additional days, October 24 and 28, 2019, the jury returned verdicts of guilty on all counts.  JA 2369-70.

The defendant supplemented his motion for judgment of acquittal after the jury's verdict (JA 2371-92), the government filed a written response (JA 2401-42), and the defendant replied (JA 2468-88).  The district court heard argument on January 24, 2020.  JA 2518.  On February 7, 2020, the district court issued a 22-page opinion denying both motions.  JA 2516-38.  In doing so, the court specifically noted that Adcor's "dire" financial condition provided "significant evidence of motive" (JA 2530), and that the "totality of the evidence" constituted a "compelling circumstantial case."  JA 2533.

On February 12, 2020, the district court sentenced the defendant and entered an amended judgment on February 25, 2020.  JA 2539-2649, 2656-61.  The defendant was sentenced to an aggregate sentence of fifteen years of incarceration, to be followed by three years of supervised release; the district court also entered orders of forfeiture and restitution of $15,525,602.55, as well as a $400 special assessment.  JA 2647-48, 2656-61.  On March 3, 2020, the defendant filed a notice of appeal.  JA 2662.  The defendant made two claims on appeal: first, that this Court erred in denying his Rule 29 motion for a judgment of acquittal based on insufficiency of the evidence; and second, that this Court erred in denying him a new trial under Rule 33 because the jury was improperly instructed on willful blindness.  The Fourth Circuit Court of Appeals affirmed. *Stavrakis*, WL 563242.  After the defendant's petition for rehearing and rehearing *en banc* was denied, the mandate issued on April 13, 2022.  ECF 398.  The defendant filed a petition of certiorari with the Supreme Court on September 9, 2022.  The Supreme Court summarily denied the petition

on October 11, 2022.  On July 28, 2023, the defendant filed this timely *pro se* Motion to Vacate, Set Aside or Correct Sentence. ECF No. 406.

<u>**FACTUAL BACKGROUND**</u>

**I.    Summary of the Facts**

In the early morning hours of July 29, 2015, an arsonist set ablaze the warehouse occupied by Adcor Industries, a machine shop owned by the defendant.  The incendiary fire was set after Adcor had experienced a substantial downturn in business and repeatedly sustained millions of dollars in losses over the course of several years.  The fire originated in an enclosed office on the warehouse floor known as the DNC Hut where a 5 gallon drum of methanol, an ignitable liquid, was recovered.  Review of alarm records showed that the alarm was disarmed in one area of the building by someone using the four-digit code just after 12:25 a.m., and the alarm for the balance of the building was disarmed using the same four-digit code at 12:33 a.m.  Smoke was observed by a passerby who called 911 at approximately 1:30 a.m.

Limited video surveillance footage was provided to law enforcement, but what was provided showed the defendant using tape to defeat an electrified latch at the front doors on July 28, 2015, the evening prior to the fire.  When interviewed by law enforcement the morning of July 29, 2015, just hours after the fire had been extinguished, the defendant indicated that the building was properly secured prior to the fire; he did not acknowledge setting the alarm or placing tape on the door to defeat the electrified latching mechanism.

As a result of the damage caused by the fire, the defendant recovered over $15 million from the insurance company, money the defendant used in part to pay off debt and to acquire luxury cars and expensive jewelry.

3

After copious evidence was introduced over the seven-week long trial, the jury convicted the defendant on all four counts in the Second Superseding Indictment. The district court denied the defendant's post-trial motion for acquittal under Rule 29, and noted that "the totality of the evidence" presented "a compelling circumstantial case" of the defendant's guilt. JA 2533.

## II.    The Trial

### A.    <u>Financial Distress (Motive)</u>

The defendant owned and operated a number of related entities (collectively, "Adcor"), which operated out of a building located at 234 S. Haven Street, Baltimore, Maryland. JA 191, 205, 208-209. One of those entities was Adcor Industries, Inc., a machine shop that manufactured parts for beverage and aerospace companies, as well as the defense industry and militaries, both foreign and domestic. JA 236, 649-650. In 2010, Adcor's business experienced a significant downturn due to the loss of a contract with Colt Industries; this downward trend then continued over time. JA 304, 319-321, 344, 347, 434-435, 634-638, 746-759, 866. The following represents the operating income/loss for Adcor from 2010 through 2014:

- 2010:  Loss of $499,014
- 2011:  Loss of $3,753,709
- 2012:  Loss of $1,847,407
- 2013:  Income of $1,137,086
- 2014:  Loss of $2,018,073

JA 183-86, 195-97, 209, 215-216, 1729-1740, 3618, 3622, 3648, 3684, 3715, 3749, 3772, 3776. Thus, over the years from 2010 through the end of June 2015, Adcor suffered total operating losses of approximately $7,699,000. JA 1739-1741, 3618-3622. Adcor defaulted on loans and subsequently entered into forbearance agreements with a succession of lenders – M&T Bank, then JOCO Financial, LLC, then 1st Mariner Bank, and then Bank of America. JA 185-90, 197-198, 207, 319-328, 512-513, 521-524, 641-642, 647-648, 1553-1556, 1765-1782, 3582, 3517, 3626-

3633.  From 2012 through July of 2015, Adcor also failed to timely pay a number of suppliers, some of whom found it necessary to send the past-due balances owned by Adcor to collection agencies.  JA 565-574, 3357, 3665- 3394, 1755-1765, 3634.

To offset these losses, in July 2012, the defendant resorted to a $5,500,000 personal loan from JOCO Financial, LLC.  JA 204-205, 501-505, 3559.  Proceeds from this personal loan were used to pay down $2,300,000 of the M&T debt that was in default, and to inject capital into Adcor in order to sustain operations.  JA 204-205, 213, 1767.  The defendant was unable to repay the JOCO personal loan as promised, and ultimately defaulted on the loan, after a number of modifications.  JA 506-513, 3629-3633.

In early 2013, the defendant sold the profitable Beverage Division to Adcor Packaging Group (of which the defendant was only a 50% owner) in order to eliminate approximately $3,300,000 of debt he owed Adcor Packaging.  JA 450-455, 208-212, 1769.  The debt had accumulated over the course of years of Adcor Packaging covering for the losses of the defendant's other business.  JA 446-448.  The defendant still owed $2,100,000 to M&T, who was insisting on severing the relationship with the defendant and Adcor, and encouraged the defendant to refinance their loans elsewhere.  JA 351.  So the defendant refinanced the mortgage on the Adcor property in order to pay off the remaining M&T debt, and cashed out $500,000 from the refinance to make a payment to JOCO Financial, further reducing his equity in the property.  JA 351, 507, 1768-1770, 3629.

Despite these transactions, when an independent accounting firm reviewed Adcor's financial statements for 2013, they concluded that "the balance of cash and cash equivalents" was insufficient to fund Adcor's operations in 2014, raising concerns about Adcor's solvency and ongoing viability.  JA 207-211, 3759.

In July 2014, Adcor again sold the Beverage Division to a competitor for $9,000,000, of which the defendant was entitled to half.  JA 1774-1775.  Eighty percent of the defendant's share was used to repay a portion of the person loan from JOCO Financial, LLC which was in default, and the remainder was used to inject capital into Adcor.  JA 455-456, 459, 534-535 542, 1774-1775, 3573.  The remaining $1,300,000 owed on the personal loan from JOCO Financial was only paid after the defendant and his wife leveraged, and later sold, four personally owned pieces of real estate in November 2014.  JA 1776, JA 3633.

Despite the 2014 sale of the Beverage Division, and the satisfaction of the JOCO Financial loan through the mortgaging of personally owned real estate, the same independent accounting firm raised concerns about Adcor's viability through 2015.  JA 213-16, 3784.  The note to the 2014 year-end financial statement read:

> The Company incurred an operating loss of $2,053,427 during the year ended December 31, 2014 and its current liabilities exceed its current assets by $898,743 as of December 31, 2014. During the year ended December 31, 2014, the sole stockholder of the Company liquidated personal assets and advanced the proceeds to the Company to fund operations and provide working capital.  As of December 31, 2014, the balance of cash and cash equivalents is inadequate to fund operations through December 31, 2015.  These factors raise concerns about the Company's ability to continue as a going concern.

Indeed, from January through June 2015, Adcor Industries continued to post net monthly losses, resulting in a six-month operating loss of $718,679.13.   JA 220, 1740-1741, 3618. Essentially, ADCOR was facing insolvency.

Further details of Adcor's financial woes were provided by Adcor executive staff, including former Chief Financial Officer Alex Levin, former business partner Brian Wallace, independent contractor/consultant Manny Skevofilax, and former Adcor Vice President Michael Brown, all of whom testified regarding conversations they had with the defendant wherein he acknowledged the substantial financial distress Adcor was experiencing in the relevant time frame. JA 443-445, 447-448, 463, 636-638, 755, 810-811, 897-898, 901-903.  In addition, a succession

of employees, including former office employees Betsy Robak and Judith Thompson, testified regarding past due balances owed to various suppliers, and persistent efforts by those companies to collect on balances owed by Adcor, such as the high volume of phone calls, emails, and contact with collection companies, and lawsuits.  JA 432-435, 441-443, 643-645, 794-797, 747-749, 778-782, 787, 797-831, 975-978, 987, 1500-1501.  In fact, in December 2014, Adcor was so behind on payment to suppliers that 80% of Adcor's payments were more than 90 days overdue.  JA 830, 3441-3463.

Over the years of the decline, rounds of layoffs reduced the number of Adcor employees from over 150 in 2009, to under 40 at the time of the fire, the lowest level in many years.  JA 744, 775-778, 865-866, 878, 973, 1444, 1643-1645.  Throughout the years, the defendant struggled to pay his employees, and there were periods where he and other executives were not able to draw their salaries.  JA 779.  On at least two occasions in 2014-2015, there were insufficient funds to pay the employees, forcing the defendant to write large checks to cover payroll.  JA 779-781.  In addition to those payments from the defendant, from November 2014 through June 2015, the defendant's wife Antonia transferred over $800,000 from her personal account to Adcor's operating account to fund operations.  JA 1783-1784, 3623.  After the fire, over $800,000 of insurance proceeds was used to repay Antonia Stavrakis.  JA 1784-1785, 3624-3625.

Multiple witnesses testified to the defendant's unbending aspirations and efforts to secure large contracts with the Department of Defense to manufacture firearms and firearms parts that would provide hundreds of millions of dollars in revenue.  JA 225, 345, 447-448, 639-940, 753-754, 899-900, 905-911, 1067-1068, 1502-1504.  Among other dreams, the defendant hoped that Adcor would land the contract to replace the U.S. Military's M-4 automatic machine gun.  JA 344, 754, 1581-1584.  The defendant's focus on "the next big deal" caused Adcor to spend significant

sums that ultimately produced no income.  JA 345, 447-448, 645, 753-754, 1069-1070, 1502-1504, 1582.  The defendant would tell employees and lenders that the company was going to revolutionize an existing weapon, could land contracts upwards of six hundred million dollars, and was "on the break of greatness."  JA 639-640, 911, 1581-1582.

In addition to attempts to land massive defense contracts, from 2012-2014, the defendant was also in talks with Beretta USA to develop/manufacture a firearm, and was hopeful that this contract would lead to hundreds of millions of dollars in revenues.  JA 894, 1066-1069.  However, by mid-2014 it was clear that the Beretta deal was dead, and Beretta opted instead to purchase Adcor's machines that had been used to manufacture parts for Beretta.  JA 1065-1066, 1542-43, 1558.  This led to Adcor filing a lawsuit against Beretta in Baltimore County Circuit Court in June of 2015, a little over a month prior to the fire. JA 3285.

As the district court found in the Memorandum and Order denying the defendant's post-trial motions, by the summer of 2015, Adcor's "dire" financial condition provided "significant evidence of motive."  JA 2530.

### B.    The Set Up

The evening before the fire, July 28, 2015, the defendant repeatedly went to the office of Adcor Human Resources employee Betsy Robak to invite her out for drinks.  JA 773, 837-44.  At the time, the defendant and Ms. Robak were the only employees left in the office area.  JA 837-40.  While Ms. Robak had been out for drinks with the defendant four or five times in the previous six years she had worked at Adcor as part of a group, she had never gone for drinks with just the defendant.  JA 772, 843-44.

The front office doors had three separate security features.  First, there was a dead bolt, seen here above the handle on the right, operated with a key.  JA 3466-67.





There were a limited number of employees with a key for this deadbolt in July of 2015: the defendant, Michael Hyatt, William Kuhrmann (JA 1264), Albert Radtke (JA 1217), Stephen Schauer (who kept it locked in his toolbox inside Adcor because he never used it) (JA 1184-86), William Wright, and Brian Wallace (JA 470).[2]  JA 385, 3295-3301.

Second, there was a magnetized and electrified lock manufactured by Brivo —from the outside, this lock was below the handle on the right (see photo above).  JA 248-49, 3466-67.  The Brivo electrified lock was connected to a security feature which allowed the lock to open from the outside by bringing a security card near a reader located to the left of the exterior doors.  JA 248-49, 401, 3466.  From the inside, the Brivo electrified lock was disarmed by using a paddle that was placed on the lower left hand side of the door.  JA 403, 833, 1272.  There was also a button by the

---

[2] Hyatt, a long-time Adcor employee and close personal friend of the defendant, testified that there were "around 15" copies of the key, and several people had the key, but did not list any by name when given an opportunity to do so.  JA 1077.

reception desk on the second floor of the office that would override the lock and allow the door to open.  JA 835-36, 1017-18.

If the doors are divided into quarters, with the bar that runs across the doors being roughly the middle, the paddle is the rectangular tab in the bottom left quadrant, seen here at 5:51:04 p.m. on July 28, 2015 as Ms. Robak approached the door to leave for the evening to meet the defendant for drinks.  JA 2896.



2896

The security card resembled a credit card, and employees were provided individual cards with a unique number that was assigned to each card.  JA 3295-3301, SJA 3-4.  When an employee swiped in, the system logged the employee, and noted the date/time.  JA 2935-2977.  This lock could also be opened with a key, but the tumbler was not working in July of 2015, so a key would not open this lock.  JA 685-86.

Third, the door was alarmed and controlled by interior keypads.  JA 717.  The closest keypad to the front door can be seen just to the right of the plant as Ms. Robak exited on July 28, 2015 at 5:51:08 p.m.  JA 2898.



2898

The alarm had two areas or partitions, partition one covered the office (JA 2979, shaded area below), and partition two covered the shop floor (and 16 zones, labeled below as Z-1 through

Z-16).  JA 2979, 717-19, 2921.  There was also a motion sensor in the front office lobby.  JA 261-62, 717-21, 730, 1089-91, 1951-55.  Separate and apart from the alarm, there was a video surveillance system with eleven cameras: eight interior, and three exterior (labeled below as SC 1-11).  JA 1134, 2479.



If the alarm door was armed, the system provided a 30-second grace period for the entrant to input a 4-digit code to deactivate the alarm before setting off the alarm and sending a signal to the alarm company and to the police.  JA 730, 735.  When leaving and arming the system "away," the alarm gave a 60-second grace period to leave before it would trigger an alarm, beeping every second until the last ten seconds when the pace of the beeping picks up.  JA 730, 738.  If any of the exterior door sensors were not in contact, the system would not arm the alarm and would display a message at the keypad that indicated the system was not ready, along with a code to identify the zone where the sensors were not in contact.  JA 730-31.  The alarm only provided

burglar or security services, not fire alarm or fire suppression services.  JA 722  In July of 2015, the defendant and nearly all of the employees who knew the code used the same code (0-2-3-4), denoted as "User 3" in the alarm records.[3]  JA 554, 559, 1083-85, 2921-23, 3295-3301.

The alarm services were provided by Protection One,[4] and review of the alarm records showed typical and infrequent maintenance calls prior to the July 29, 2015 fire: a low battery on July 21, 2014; an inspection and keypad replaced on May 22, 2014; and contacts on an overhead garage door replaced on December 9, 2013.  JA 724-27.

After the fire, there were requests for Protection One to download information from the panel, and then the alarm panel was removed at the request of Travelers Insurance, so Protection One replaced it and billed $216.24 for doing so.  JA 722, 724.  After that work was done and noted in August of 2015, the next call for service was not until March 2, 2017, related to a fault at a keypad, which was resolved; Protection One followed up with Adcor, and the service notes reflect that the system was functioning properly and the customer was very happy with the service Protection One provided.  JA 728.  At the time of trial, Protection One continued to provide alarm services to Adcor, and there were no upgrades to the services (e.g., fire alarm or fire suppression) or hardware added (e.g., motion sensors, or contacts).  JA 739-40.

Turning back to the video surveillance the evening before the fire, as the above video surveillance footage showed, at approximately 5:51:08 p.m., Ms. Robak left Adcor's office area through the front door.  JA 831-32, 2896-98.  At the time, there were two machinists on the shop floor, Ed Thomas and Greg Finley.  JA 1447.  They worked the 3 p.m. to 11 p.m. shift in another

---

[3] There were a few Adcor employees who testified that they used a code uniquely assigned to them prior to July 29, 2015, but the alarm records available, which were limited to the last 100 events, indicated solely User 3 activity.  JA 559, 2921-2923

[4] Protection One merged with ADT.

area of the building with no view of the front office doors.  JA 1447.  After Ms. Robak left, the defendant was alone in the office area.

At 5:52:06 p.m., approximately one minute after Ms. Robak was observed leaving through the front door, the defendant walked directly to the front office door (JA 2899); at 5:52:14 p.m., the defendant applied tape to the Brivo electrified latch.  JA 833-34, 2900.



The defendant then set the alarm at 5:52:19 (JA 2902, below left), exited through the front doors, and appeared to check the tape as he exited at 5:52:31 p.m. (JA 2903, below, right).  JA 2904-07.





2903

The defendant was not recorded by the surveillance camera for several seconds, but then returned to the front door at 5:53:17 p.m. (JA 2907, below, left), and pulled the front door open without placing his Brivo card near the reader.  JA 2908 (below, right).



2907



2908

The defendant then proceeded to the alarm keypad and disarmed the alarm.  JA 2909, JA Vol. IX, Ex. 1C-4.  The alarm records reflect the alarm as being armed at 5:52 p.m., and then disarmed at 5:53 p.m. on July 28, 2015.  JA 2921 (events 27 and 26, respectively).

The defendant then took a roll of tape from his pocket (JA 2910, below, left) and applied more tape to the same area (JA 2915, below, right).  JA 2910-15.






Frame Time 5:53:35 PM  7/28/2015          Frame Time 5:53:48 PM  7/28/2015

After applying tape the second time to the Brivo electrified latch, the defendant set the alarm again at 5:54 p.m.  JA 2916, 2921 (event 25).  Then, the defendant left a second time, this time for the night.  JA 2917-18.  Shortly thereafter, the defendant met Ms. Robak for drinks.  JA 841-45.

While the footage of the defendant's initial taping of the electrified latch is partially obscured by his position between the door and the camera, review of the surveillance footage and Brivo records further confirmed what the defendant did.  First, the paddle is the rectangular tab in the bottom left quadrant, visible just over the defendant's right shoulder as he initially approached the door at 5:52:06 p.m., the Brivo electrified latch is immediately to the right of the push paddle. JA 2899 (below left).  After the defendant was bent at the door in the area of the electrified latch

at 5:52:14 p.m. (JA 2900), the latch was no longer visible to the right of the push paddle at 5: 52:16

p.m.  JA 2901, below right; SJA 1-2, 5-11.



2899



2901

Second, the Brivo records, which record activity at the front office doors as "Office Door,"

record no card reader activity at this time, a clear indication that the defendant had taped the Brivo

electrified latch and effectively defeated this security feature.[5]  JA 426, 2938, JA Vol. IX, Ex. 4.

Additionally, when the defendant returned inside after the initial taping, he did not use the

Brivo swipe pad, conclusively establishing that the electrified latch had been defeated.[6]

---

[5] While the defendant on appeal appears to try to cast doubt as to whether he had taped the Brivo electrified latch at the front office doors when he approached the first time (Def. Br. at 16-17, FN 12), the above surveillance footage and Brivo records clearly established that the defendant applied tape to the Brivo electrified lock on his first pass, a point necessarily accepted by the defendant at trial (JA 2217-20), and which was characterized by the district court as "unassailable." JA 2565.

[6] Not only does the evidence clearly establish that the defendant walked directly to the door and taped the electrified latch, the defendant conceded this fact throughout the trial, including during opening statement ("as [the defendant] approaches the door, he puts the label on the latch to depress that latch…" (SJA 1-2) and closing argument ("He doesn't lock up often. But when he does, he used tape," (JA 2219), and "he thinks the tape did not work" (referring to the first attempt), and then, "applies more tape.")  JA 2219-2220.  As the district court said during sentencing, that the defendant applied tape twice was "captured in the video" and is "unassailable."  JA 2565 (see also, JA 2524).

Both night shift employees, Richard Glendenning and Edward Thomas, testified that in the summer of 2015, the last person leaving the office typically did not set the alarm.  JA 998, 1003, 1450-51.  The night shift supervisor would come around and ensure the exterior doors were secure after the last of the office employees left.  JA 994-99, 1450-51.  The defendant's arming of the alarm that night when he left prior to 6 p.m. was not the normal procedure.

Mr. Thomas noted that at approximately 5 p.m. to 5:30 p.m. the evening before the fire, he happened to look up at the second floor office windows which look down on the shop floor.  JA 1447.  When Mr. Thomas did so, he saw the defendant looking out of a second floor office window down on the shop floor where he and Finley were working the evening shift.  JA 1447-48.

At approximately 7 p.m., Mr. Thomas, who worked off and on at Adcor for 25 years and had done the close-up procedure many times over that quarter century, began his rounds as part of the close-up procedure to ensure the building was secure.  JA 1443, 1445, 1449, 1457.  As Mr. Thomas testified, the purpose of the close-up procedure he does is to "secure the office alarm and lock the door."  JA 1449.  As Mr. Thomas entered the office area (from the shop floor) to ensure it was secure shortly after 7 p.m., he set off the alarm that the defendant set at 5:54 p.m., requiring him to disarm the alarm at 7:02 p.m.  JA 2921 (event 24), 1450-51, 1455.

After disarming the alarm, Mr. Thomas went over to the front office doors to ensure they were locked and secured.[7]  JA 1452, 1468.  After ensuring the front office doors were secured, Mr. Thomas set the alarm (JA 2921, event 23), and exited the front office area, headed through the

---

[7] The defendant noted that Mr. Thomas "never stated he deadbolted the front door when interviewed by law enforcement or in his testimony before the grand jury." Def. Br. at 12, FN 10. Mr. Thomas candidly explained that he said he "wasn't a hundred percent sure.  It's an automatic response, you know, walking around doing the lock-up procedure, so I assumed I followed my procedures."  JA 1472.  And Mr. Thomas explained that his objective when doing the close up procedure was, "To secure the office, to deadbolt the front door, and set the alarm."  JA 1473.

programming doors, waited to ensure the alarm properly set, and then returned to the shop floor. JA 1452-54.  After 11 p.m., Mr. Thomas and Mr. Finley finished their shift, secured the shop floor, set the alarm to the shop floor at 11:16 p.m., turned off the lights, and exited out of the shop door. JA 1455-56, 2921 (event 22).  Mr. Thomas testified that he never experienced any issues with the front office doors or the alarm in all the years he worked at Adcor and secured the building as part of the close-up procedure.  JA 1457-58.

### C.      The Incendiary Fire

On July 29, 2015, at 12:25 a.m., partition one, the area that covered the office, was disarmed using the four digit alarm code.  JA 2921 (event 20).  At 12:33 a.m., partition two, the shop floor, was disarmed using that same code.  JA 2921 (event 18).

There is no entry for a Brivo card being used near these times.  JA 2938.  The Brivo records show the last event on July 28, 2015 was at 21:08 (9:08 p.m.) when Edward Thomas used his Brivo card to access the "Shop Front Door"; the first event on July 29, 2015 was at 3:03 a.m. when the defendant, accompanied by Det. Reno, used his Brivo card to access the "Gun Room Main."  JA 407, 690-91, 2938.

Michael Hyatt, at the time the general manager, effectively the number two at Adcor, and who was described as being very close with the defendant[8] (as Mr. DeMilt explained, "anything that Mr. Stavrakis wanted done, Mr. Hyatt would take care of" JA 1504) was the head of IT and oversaw the security system, to include the video surveillance system.  JA 1088-90, 1504. Sometime that morning, after Hyatt was identified to law enforcement as being the head of IT and security, ATF SA Lisa Herb requested that he provide 24-hours of video surveillance recordings

---

[8] Hyatt described going out for drinks with the defendant after work between one and three times per week, and spending time at the defendant's residence and at family events.  JA 1146-47.

to include the time of the fire.  JA 389, 390, 1091.  The video surveillance system was motion-activated and recorded for seven days, meaning that it only recorded when it sensed movement, and that it maintained recordings for a running period of seven days, deleting the oldest day as it recorded the current day.  JA 1092-93.

Hyatt and several other Adcor employees, including Kuhrmann, reviewed the video surveillance footage throughout the day on July 29, 2015, along with Baltimore Police Department Arson Det. Michael Reno.  JA 1094-96, 1296-97, 1568.  Hyatt testified that a "lot of people upstairs in the office gathered" and were "focused on the video where you could see the fire start" and he was able to list a number of Adcor employees, but remarkably could not recall if the defendant (the owner and president of Adcor) was among those reviewing footage the day of the fire.  JA 1094-96.

When copying files at ATF SA Herb's request for 24-hours of footage, Hyatt was clear that he selected all of the responsive files, and did not delete anything.  JA 1097, 1099.  Hyatt explained that if any file was created and not provided, the only explanation was that someone "would physically have to remove that file" from the server, in other words, delete that footage, which could be done from any computer on the network.  JA 1097-99.  Hyatt provided law enforcement with a disc of surveillance footage from 4 a.m. on July 28, 2015, through 8 a.m. on July 29, 2015.  JA 390-91, 393, 416, 2890-91.

It was not disputed that some video surveillance footage was not provided.[9]  The disc of video surveillance that Hyatt provided does not show Mr. Thomas setting off the alarm at the front

_____

[9] In closing argument, the defense conceded that there was missing footage, and cited specifically to footage from SC-1 of the alarm being disarmed and entry being made through the front office doors at 6:40 a.m. on July 28, 2015, and hypothesized that was because Hyatt "drew the box one file too small" when copying the files for law enforcement, inadvertently not including that file/event.  JA 2228-29.

door at approximately 7 p.m. on July 28, 2015 (JA 2890, 7/28/15, 19:00:00, SC 1 Front Door; JA Vol. IX, Ex. 1B), and does not show footage of an entry or activity between 12:25 a.m. and 12:33 a.m. on July 29, 2015.  JA 2890 (7/29/15, 0:00:00, SC 1 Front Door; JA Vol. IX, Ex. 1B, JA Vol VII, Ex 14A).

Further, Det. Reno indicated the footage he observed of the fire when he was reviewing the video surveillance at Adcor on July 29, 2015 that appeared to depict the outline of a person moving near the DNC Hut – footage that was not provided in the footage Hyatt provided to law enforcement.  JA 1570-71; JA Vol. IX, Ex. 1B.  When Mr. Kuhrmann viewed the security camera footage of the fire at trial, he testified that he was not sure if it was the same fire footage he viewed on July 29, 2015.  JA 1298.

After observing what appeared to be a person moving near the DNC Hut as the fire started in the video surveillance footage, Det. Reno directed Hyatt not to touch the surveillance system as he (Det. Reno) was going to make arrangements to have the footage retrieved by a member of Baltimore Police Department's Video Retrieval Unit.  JA 1571, 1575.  At trial, Hyatt testified that he did not recall this directive.  JA 1165-66, 1177.

The fire was started in an enclosed office area of the warehouse known as the DNC Hut where a charred 5-gallon drum of methanol was found.  JA 376, 377-78, 3437 (below, right), 3438 (below, left).  There was no alarm, there were no signs of forced entry, and nothing was stolen. JA 249, 254, 360, 369, 386.  The methanol, an alcohol-based solvent, was normally stored in the back left-hand corner of the warehouse in the Beverage Shipping area, and it was only ever used by Mr. Kuhrmann to clean a certain part for a specific job.  JA 379, 1290-93, 1567.




Clearly, the arsonist: (1) had a key to the front door deadbolt; (2) knew the tape was placed to defeat the Brivo electrified latch/swipe card system; (3) knew the 4-digit alarm code; (4) knew the layout of the building and where the keypads were located; (5) knew where the methanol was stored; and (6) knew where the DNC Hut was located. To enter the building, disarm the alarm, locate the methanol, and then proceed to the DNC Hut in a large and darkened warehouse, even with the aid of a flashlight, required someone with a great deal of familiarity of the layout of ADCOR.

An individual driving by reported smoke emanating from the building at approximately 1:30 a.m. JA 229-33. The Baltimore Fire Department responded to Adcor and forced entry through the shop front door into the warehouse where they found smoke banked near the floor. JA 596-98, 613-14. As Baltimore Fire Department Lt. Meyers and the other first responders turned a corner in the dark warehouse, they observed a large orange glow, which turned out to be the DNC Hut fully involved, that is, with fire coming from several areas of the structure. JA 599. The firemen had the fire under control in approximately ten minutes (by approximately 1:55 a.m.), and then began search and rescue operations to ensure that the fire had not spread and that there were no injured individuals near the fire. JA 599-603, 605. Since the smoke was banked down and visibility was poor, the firefighters sought to ventilate the building. JA 602. The fire was contained

to the DNC Hut.  JA 607.  No one was injured as a result of the fire or fire suppression efforts.  JA 391-92.

### D.   The Cover Up (Obstruction)

#### 1.   Tape removed

Phone records from a number of current and former Adcor employees showed efforts to contact Adcor employees shortly after 2 a.m.  JA 1625-1626, 2997.  By 2:47 a.m., the defendant was on his way to Adcor, and he arrived just prior to 3 a.m.  JA 1619, 2994.  The next two employees to arrive per cell phone records were Hyatt (approximately 3:18 a.m.,) and Kuhrmann (approximately 3:35 a.m.).  JA 2990-2991.

In an effort to vent the smoke from the building, Baltimore Firefighter Cianferano was the first to move through the lobby and open the front office doors at 2 a.m., and did so by simply pushing on the bar, so: (1) the deadbolt was not locked/engaged; and (2) the Brivo electrified latch was still taped and not engaged.  JA 627-28, 633, 2920 below left).

At 4:39 a.m., when ATF SA Lisa Herb took the below photograph (JA 3304, below right), the tape the defendant had applied at 5:52 p.m. and 5:54 p.m. on July 28, 2019, was removed from the front door.  JA 363-364, 625-629.  Of the three Adcor employees present in that time frame, only the defendant knew that there was tape on the front door latch.

23



### 2.      Missing video files, then HDDs disappear

As indicated above, the surveillance video Hyatt provided to law enforcement on the day of the fire did not include footage of an entry or activity at the time the front door alarm was disarmed, nor did it show other video that would have been expected to be recorded, such as Mr. Thomas setting off the alarm at 7 p.m. or the video Det. Reno observed when watching the surveillance video with Hyatt at Adcor.  JA 1094-96, 1153.  The video files required proprietary software to play, and ATF was not able to view the video files until early September 2015.  JA 1694-1695.

Hyatt testified that when he was reviewing video footage later, which he believed he was doing with Kuhrmann on Thursday (July 30, 2015), he received an error message when attempting to access the two HDDs that stored the video surveillance footage, so he removed the two HDDs, and left them on a table near the server on the second floor of the office.  JA 1099-1102.  Hyatt acknowledged knowing that a can of methanol was found where the fire was determined to have started, which he found "odd," but he was not "focused" on the video surveillance footage as evidence in a criminal investigation.  JA 1103.

After removing the two HDDs that contained the video surveillance footage and leaving them on a table in the second floor of the office area, Hyatt did not think about them again until the insurance investigator asked for the HDDs that contained the surveillance footage on Friday, July 31st; at that point, Hyatt looked for the HDDs where he had left them and could not find them.[10]   JA 1099, 1103-04.   Hyatt testified that he looked for the HDDs in the immediate area where he had left them, and that he also advised some Adcor employees in the office who also looked for the HDDs.   JA 1105-06, 1107.   The two HDDs have not been recovered to date.

Hyatt left for North Carolina on vacation on Sunday (August 2, 2015).   JA 1107-08.   Hyatt testified that he did not tell the defendant about the missing HDDs until after ATF Hodges called him and asked him about the missing HDDs on Monday or Tuesday (August 3rd or 4th, 2015). JA 1108-09.   Hyatt offered to return from vacation to look for the HDDs, but the defendant told Hyatt to stay and enjoy his vacation, and that he would put a search party together to find the HDDs.   JA 1108-09.

The other Adcor office employees at the time, specifically Ms. Robak and Ms. Thompson, testified at trial they never recalled looking for, or hearing anything about, missing HDDs.   SJA 13-14, 18.   The jury heard that Ms. Charalambopoulos testified in grand jury that she never recalled looking for, or hearing about, the missing HDDs; however, at trial she testified that she could not recall specifically about the HDDs, but did recall seeing someone looking for "files" and at trial was now making the "connection" that they may have been looking for the missing HDDs.   JA 1031-1032.   Kuhrmann, the shop foreman, never looked for the HDDs.   JA 1301-02.   Only Dayson Broadwater testified that he recalled looking for the HDDs; however, he did not look for the HDDs

---

[10] Kuhrmann testified that he recalled seeing Hyatt "rummaging" around looking for something the day after the fire, Thursday, July 30th.  JA 1300-01.

in the office area, but on the shop floor near his work station in the shipping and receiving area. JA 1212-1213.

While the cleaning/restoration crew working in the office area was alleged by Hyatt to have possibly thrown out the HDDs, Hyatt confirmed that he never asked any of the cleaning crews about the missing HDDs, but added the majority of them spoke Spanish, and he barely speaks Spanish well enough to even "order a taco," so he did not bother to ask about the missing HDDs. JA 1109, 1173-74.

However, Mr. Garrett of Ductz cleaning, who was doing work in the office area immediately following the fire, was never asked about the missing HDDs.  JA 1242.  And Mr. Dorsey, the supervisor for First Choice who was doing the restoration work in the office area immediately following the fire, as well as the foreman on the job, Freddy Hernandez, and at least one other employee on the job, Ernesto Hercules, all spoke English, and they were not asked about the missing HDDs.  JA 1316, 1328-1329.  And Mr. Vera, who was the foreman for Belfor that was running a large restoration and clean-up project in the warehouse, and who had workers in the office area, was also never asked about missing HDDs.  JA 1257-1260.

In fact, the defendant was so happy with Belfor that he took the managers out for food and drinks when they had finished the project (JA 1260); and rewarded First Choice with additional restoration work.  JA 1330-1331.

Further, as all of those who were doing restoration/clean up after the fire testified, they never discarded anything when doing work relating to an insurance claim without completing a "content disposal" form to document the discarding of any damaged property and obtaining consent from the owner.  JA 1241-1242, 1328-1329, 1258-1259.

The defendant by his actions, and lack of actions, clearly never thought that the workers for one of these cleaning/restoration crews was responsible for discarding the two HDDs of the

video surveillance footage.  The defendant never looked for the HDDs, never asked anyone else to look for the HDDs, never asked anyone of the supervisors on these cleaning crews about the missing HDDs, and then rewarded the restoration companies whom his general manager blamed for discarding the HDDs.

### 3.   The defendant denied setting the alarm/securing the building

The defendant was interviewed early in the afternoon on July 29, 2015, by ATF SA Herb in a conference room at Adcor.  JA 381-88.  The interview, which was casual and focused on gathering data, lasted less than an hour.  JA 382.  The defendant reported no prior vandalism, burglaries, or threats of any kind.  JA 384.  The defendant told SA Herb that all the windows and doors were locked and secured at the time of the fire.  JA 384.  When asked about the 5-gallon drum of methanol found in the DNC Hut, the defendant indicated it was not normally stored in that area.  JA 384.  The defendant told SA Herb that he, Hyatt, Kuhrmann, and the night shift employees had building keys.[11]  JA 385.

When SA Herb asked the defendant who secured the building and set the alarm on July 28, 2015, prior to the fire, the defendant stated that he would not be the person to secure or lock the front doors, and that he would not set the alarm, because that was not something that he did.  JA 386.  In addition to denying that he had locked the door and set the alarm prior to the fire, the defendant did not mention taping the door at any time.  JA 425.

When asked about former and possibly disgruntled employees, the defendant told SA Herb that two employees had left Adcor, Mr. Brown and Mr. DeMilt.  JA 387.  However, when SA Herb

---

[11] The night shift supervisor in July of 2015, Mr. Glendenning, testified that the key he had only worked the shop front door, not the front office doors.  JA 1005-06.

asked the defendant if he had any thoughts about who or how the fire started, the defendant replied that he was "baffled" and that he had no idea what caused the fire.  JA 388.

### 4.    The defendant accused Michael Brown (repeatedly)

By July 31, 2015, however, the defendant was squarely pointing the finger at former Adcor Vice President Michael Brown, who had left Adcor in early September of 2013, as being responsible for setting the fire at Adcor on July 29, 2015.  SJA 22-28.  The defendant repeated this negative information on Mr. Brown to ATF multiple times (July 31, 2015, and August 4, 2015), and indicated the same to investigators for Travelers (August 28, 2015).  JA 278-81, 1672-76, 1686-87.

On July 31, 2015, the defendant relayed a bizarre story to ATF, based on double hearsay, that Mr. Brown had threatened to get on the roof and kill coworkers at Adcor with carbon dioxide. JA 1677-78.  The next morning, the defendant flew to Florida, returning on a flight to Maryland on Monday night (August 3, 2015).  JA 1627-28.

The defendant also falsely claimed to ATF (on August 24, 2015) and Travelers (on August 28, 2015) that Mr. Brown's wife, also a former Adcor employee, had an affair with another Adcor employee, which the defendant indicated was a possible motive for Mr. Brown to commit the arson, as he (Mr. Brown) knew of the affair.  JA 1692-93, 2159-2160.  As established at trial, there was no affair, and clearly Mr. Brown had no knowledge of such a false rumor.  JA 941, 966, 1206-1207.

On October 21, 2015, at the examination under oath ("EUO") with Mr. Roswell, an attorney who had been retained by Travelers Insurance, the defendant stated that he had no idea if the fire was accidental or intentionally set, and that he had no issues with former employees.  JA 672-73, 679-80.  After Mr. Roswell specifically stated it was an intentionally set fire that came shortly after the alarm was disarmed by someone (facts which were obvious to the defendant and

everyone who observed the DNC Hut and had knowledge of the alarm records), the defendant relayed the negative information about Mr. Brown yet again.  JA 672, 697-702.

As a result, ATF followed up with Mr. Brown, interviewed him, and obtained home video surveillance footage that showed he was in his home at the time of the fire.  JA 1705-1706.

### 5. The front office doors were quickly replaced

The defendant viewed the security video footage in the days after the fire, as he testified during the EUO on October 21, 2015, while being questioned by Mr. Roswell on behalf of Travelers Insurance.  JA 671.  This footage included the video footage of the defendant taping the front office doors the evening prior to the fire.  JA 692-696.

By the third week of August, less than a month after the fire, contact was made through a friend of the defendant's from childhood, Mr. Souranis, who was also doing electrical work at Adcor post-fire, to have the front office doors at Adcor replaced.  JA 944-945, 2069-2070.  By August 26, 2015, less than a month after the fire, the front office doors were replaced, and the old doors were discarded.  JA 945.  By the time ATF and Travelers were able to review the video footage and observe the defendant taping the lower lock, the front office doors had been thrown away.  JA 278-79, 284, SJA 16-17.

According to the testimony of Mr. Huzzy, a fire alarm engineer who had been retained by Travelers, it was surprising that the front office doors had been replaced without obtaining prior permission from Travelers, especially since the doors were relevant to the investigation.  JA 300-01.

### 6. Further false explanations during the EUO

For the first time during the EUO on October 21, 2015, the defendant provided an explanation as to why he had taped the front door as Mr. Roswell reviewed the video surveillance footage with him (which was played on the defendant's attorney's laptop).  JA 705.  While

reviewing the video at the EUO with Mr. Roswell, the defendant indicated that the door would

constantly stick as the "throat was broke" which would prevent the alarm from working.  JA 684-

685.  The defendant explained that on July 28, 2015, as he left, that he set the alarm, and then heard

the alarm beeping, indicating to him that it was not properly set, so he returned to disarm the alarm,

and apply tape.  JA 695.  He explained that he applied tape to fix this recurring issue.  JA 695.  He

"happened" to have tape in his pocket, he explained, because he was doing "some grouting at

home."  JA 707.  He also testified at the EUO that he had this problem with the front door sticking

*every time* he tried to set the alarm.  JA 687.

This explanation was false for several reasons:

        a.      As indicated supra at 21-25, the defendant taped the door before attempting
to set the alarm for the first time.

        b.      The defendant *was* able to set the alarm, which he would not have been able
to do if the front doors were not properly closed and making contact with the sensors.  JA 692.

        c.      The fact that he taped the front door to defeat the need to swipe in is clearly
indicated on the video as he was able to pull the door open without swiping in when he re-entered.

        d.      The defendant was the owner of the business, and there was testimony at
trial that he occasionally opened and closed the office, including when he worked on weekends.
JA 680, 687, 1649.  As such, the defendant would have been fully aware of the operation of the
alarm system, including the sounds it made.  The defendant therefore could not have misconstrued
the normal, customary, sound of the alarm activation to mean that there was a problem with the
alarm.

        e.      Of the twenty-two Adcor employees who testified at trial, only six noted
any problem whatsoever with the front office doors, let alone a chronic recurring issue as the
defendant described during the EUO.  Four individuals (Ms. Robak, Mr. Brown, Mr. Kuhrmann,
and Mr. Glendenning)[12] noted that on rare occasions prior to the fire, the front office doors were
not closed sufficiently to bring the sensors on the front doors into contact, which would prevent
the alarm from being set.  JA 834-35, 881, 1000-01, 1004.  The simple solution to this problem

---

    [12] At trial, Ms. Thompson noted mechanical problems with the front door not opening
"every once in a while."  JA 980-81.  This was in conflict with her prior grand jury testimony, and
after reviewing her grand jury testimony, relevant portions which were read the jury, Ms.
Thompson indicated that she did not recall any mechanical problems with the front office door.
JA 983.

was to "jiggle" or move the door slightly to bring the doors into alignment.  JA 834-35, 881, 1000-01, 1004.

Mr. Kuhrmann, the shop foreman, never experienced this problem personally in the five years he used the front doors prior to the fire, but it was brought to his attention on two occasions prior to the fire.  JA 1267-70.  Following up on the complaints, Mr. Kuhrmann inspected the front office doors and observed that the doors seemed to swell in the heat and not close properly.  JA 1267-70.  Mr. Kuhrmann noted that this issue would not prevent the doors from being locked or the alarm being set.  JA 1270.  Mr. Kuhrmann attempted to solve this problem by filing the square or the area where the flipper or latch fell in while Mr. Hyatt looked on.  JA 1271.

Two witnesses (Hyatt, and Aspasia Charalambopoulous, the defendant's sister-in-law (JA 1010)) described much more frequent and diametrically opposed issues with the front door.  Hyatt, the general manager at Adcor in 2015, noted the office staff informed him that people walked in the front office doors without being buzzed in.  JA 1074-76.  After this was brought to his attention, he testified that he worked on it with Mr. Kuhrmann by adjusting the gas shock at the top of the door so the door would close more forcefully.  JA 1074-76.  Hyatt never experienced these problems first hand, and despite testifying in grand jury that he had never had a problem, at trial he testified, "Over 20 years I'm sure it's happened."  JA 1082-83.

Ms. Charalambopoulous highlighted the opposite problem, that is, when she worked the reception desk and attempted to buzz people in, they were not able to open the front doors.  JA 1019-21.  She testified that she would press the button that would make a buzzing sound, which would allow the person to open the front office doors and enter, but the locking mechanism would

not release, so the person would not be able to enter.[13]   JA 1019-21.   At trial, Ms. Charalambopoulous testified that this was a frequent problem; however, when she testified in grand jury, she indicated that it happened "five times total in the last five years.  So it's not like it was a big problem."  JA 1025.

On cross examination, Ms. Charalambopoulous noted for the first time an issue with individuals opening the door without being buzzed in.  JA 1037.  In support, a portion of the surveillance video was played by the defense purporting to show that the front door remained open on its own when Ms. Charalambopoulous and Ms. Robak left the office for a one-minute break.  JA 1037-38.  However, on redirect, the government clearly established that the door stayed open in the video the defense played because on her way out the door, Ms. Charalambopoulous extended the deadbolt above the Brivo electrified latch, preventing the door from fully closing.  JA 1037-43.

f.      Not one of the twenty Adcor employees[14] who were asked at trial about tape and the front doors ever recalled seeing tape in the area of the latch on the front office doors, or ever even hearing/discussing taping the front office doors.

At the sentencing hearing, the district court found that the defendant's replacement of the doors with no notice to investigators or the insurance company (item 5, supra) constituted obstruction of justice, finding that doing so was "almost tantamount to spoliation" as the doors represented a "huge, important piece of evidence."  JA 2563-64.

_____

[13] Ms. Robak noted that on occasion people looking to open the front door pulled on the door before the receptionist hit the "buzzer" to release the lock to allow them to enter, so they would have to wait and to be buzzed in a second time.  JA 836-37.

[14] JA 471 (Wallace), 837 (Robak), 927 (Brown), 964 (T. Brown), 982 (Thompson), 1006 (Glendenning), 1034 (Charalambopoulos), 1051 (Irizarry), 1123 (Hyatt), 1187 (Schauer), 1197 (Broadwater), 1220 (Radtke), 1226 (Workman), 1274 (Kuhrmann), 1458 (Thomas), 1515 (Betz), 1532 (Walsh), 1604-1605 (Brant), 1654 (West), SJA 12.  Mr. DeMilt and Mr. Skevofilax were not asked about tape on the front doors.

The district court also found that the defendant's act of removing the tape he had placed on the front doors in the early morning hours of July 29, 2015 (item 1, supra at 33-35) justified the obstruction of justice enhancement.  JA 2564-65.  In this regard, the district court specifically found at the sentencing hearing that the defendant applied the tape twice, a fact which was "unassailable."  JA 2565.  Further, by the time ATF SA Herb took the picture (Ex. A-2, JA 3304), the tape was gone, and that there was "no evidence that anyone but the defendant would have known of the tape.  So how else would anyone have known to remove it?  That's tampering with the evidence."  JA 2565.

As noted supra at 48 and FN 13, despite the defendant's sworn statement that he taped the latch "every time" he locks up, not a single other employee testified that they ever recalled seeing tape near the latch of the front office doors, and never heard anyone ever talk about tape at the front office doors.

And Hyatt testified that after he watched the video of the defendant taping the front door with the defendant and the defendant's attorney prior to the EUO, he left right away.  JA 1121-23, 1125.  While the video of the defendant taping the door was playing, Hyatt said nothing to the defendant; and after, Hyatt never brought it up again—he never asked the defendant why he had taped the latch on the front office doors, and Hyatt never discussed it with any other Adcor employee.  JA 1122-23.

### E.    The Insurance Claim: Use of Proceeds and False Claims

The insurance policies excluded coverage for "Intentional Loss," as well as "Dishonest or Criminal Acts," and concealment/dishonesty/fraud.  JA 1336-1337.  In clear violation of the policies, the defendant, through a public adjuster, submitted claims (via interstate wires) in excess of $21 million.  JA 1359, 1422-1423.

### 1.    Use of Proceeds

Ultimately, Travelers paid over $15 million on the claim.  JA 712, 1436, 1800-1802.  The proceeds were used to replace a number of machines, some of which had been in service since the 1980's and 1990's, with five brand new state of the art machines which cost approximately $1.9 million.  JA 1789-1793, 3020-37, 3638.  The defendant transferred an additional $600,000 to a PNC account in his wife's name, after which additional monthly payments to his wife of approximately $6,000 followed.  JA 1784-1785, 3625, 3637.  Ultimately, the bulk of these transfers were used to pay off the private loans he had procured prior to the fire.  JA 1785-1787, 3637.

The defendant also made several purchases of personal property in 2015 in the months following the fire.  JA 1794-1799, 3636.  The purchases included a BMW for $52,890.95 (registered to his wife and used by one of his daughters); a Harley-Davidson motorcycle for Adcor employee Kuhrmann for $25,500 (JA 1307); a Mercedes-Benz Sport Utility Vehicle for $98,499.20 (registered to him but used by his wife); a men's Rolex watch for Adcor employee Hyatt for $14,787 (JA 1150); a ladies diamond ring for $12,500; and a second men's watch for $7,800.  JA 1794-1799, 3636.  The personal purchases were made between the end of August 2015 and the middle of December 2015.  JA 3636.

The defendant also gave checks to his employees in December of 2015, most notably $10,000 each to Hyatt and Kuhrmann, which were alternately described as tool reimbursement to replace property lost in the fire or Christmas bonuses.  JA 1147, 1149-50, 1305-06.  Despite the defendant's claim that he "periodically gave bonuses to his employees" (Def. Br. 27), Adcor employees universally testified that these extra checks were either the *only* bonus they ever received, or in the case of the longtime employees, the first bonus in ten or more years.  JA 773, 1007, 1147-49, 1182, 1188, 1208-1209, 1305-1307, 1466, 1519-1520, 1650.

### 2. False Claims: Northrop Grumman Site Inspection

The defendant also made false statements and omitted material facts in an effort to gain a benefit and as a result, caused Travelers to pay out additional money on the insurance claim.  For example, the defendant lied in an effort to expedite the cleanup of Adcor by falsely claiming that Northrup Grumman was planning a visit to Adcor on August 11, 2015, pertaining to a possible contract.  JA 1345, 1962-1963, 3048.  However, the only visit on that date was with Orbital ATK and related to the possibility of a series of relatively small contracts for machined parts.  JA 1959-1963.  The expedited clean-up approved by Travelers based on the defendant's false representation regarding this fictitious site visit/tour with Northrup Grumman required around-the-clock crews and added between $300,000 and $400,000 to the clean-up cost.  JA 1253, 1260.

### 3. False Claims: $30,000 For Still-Working Alarm and Video Surveillance Systems

The defendant directed Hyatt to get quotes for a new alarm system and video surveillance system.  JA 1126, 1129.  The defendant's knowledge and active involvement in this process is evident at every stage of this part of the claim.   First, the defendant's childhood friend and electrician Mr. Souranis made the initial contact with Mr. Cook, a fellow electrician whom Souranis had worked with over the course of many years.  JA 855, 2051, 2060-61.  Notably, Mr. Souranis claimed a lack of knowledge and/or failure of memory as to whom at Adcor asked him to see if he could find somebody to "repair" the alarm system, when that discussion had taken place, the parameters of the work Strat Security was asked to perform, the status of the existing alarm and video surveillance system, and questions Travelers had about the bid from Strat Security, including an on-site inspection that followed.  JA 2075-78.  Skepticism about Souranis's lack of knowledge and memory grows when one considers that Souranis was at Adcor daily immediately after the fire, and often over the course of the next several months; his company ended

up getting paid approximately $250,000 by Travelers Insurance for the electrical work done in the wake of the fire.  JA 2067-68, 2069.

Second, and perhaps most critically, the defendant specifically directed Hyatt, the general manager, to follow up with Strat Security to upgrade the existing system.  JA 1126, 1129.  The quote the defendant directed Hyatt to get would have been an upgrade to a more modern and integrated security system.  JA 1126-28.  While the fire had not damaged any of the security cameras or the alarm system, during the clean-up, two of the eleven cameras were damaged.  JA 1128-29.

Third, the defendant met with Mr. Cook and Mr. Price from Strat Security. JA 769-771, 855-858.  In early September of 2015, Mr. Price met with Hyatt who introduced him to the defendant for the purpose of presenting Strat Security's estimate for the work of replacing and upgrading the existing alarm and video surveillance system.  JA 769-70.  Mr. Price made his sales pitch to the defendant and explained to him how Strat Security could combine everything into one system.  JA 769-71.

Fourth, after the defendant met with Strat Security in early September and the estimates were received, the defendant directed Hyatt to send the quotes to Goodman, the public adjuster, whose only involvement was the handling of the insurance claim.  JA 1126, 1131-32.  On September 14, 2015, consistent with doing whatever the defendant directed him to do, Hyatt forwarded the quotes for the upgraded and integrated security system, which totaled over $30,000, to Goodman, carbon copying the defendant.  JA 1130-37, 1410-13, 3050-54.

Goodman was the executive vice president of Goodman-Gable-Gould Company/Adjustors International ("GGGs") with nearly 50 years of experience as a public adjustor.  JA 1301-92.  As the public adjustor hired by Adcor, GGGs worked to assist the insured in the claims process.  JA 1393.  In that process, as Mr. Goodman made clear, the insured's truthfulness is "very important"

as the adjustor relies on the insured's representations regarding loss.  JA 1395, 1400-01.  Mr. Goodman knew the defendant (the insured), since 2003, as the GGGs handled prior business-related insurance claims for him, and Mr. Goodman had socialized with the defendant on occasion. JA 1396.

From the wording of the email, specifically the phrase "direct replacements," the proposed estimate was to replace what was there and the inherent representation was that the existing alarm and video surveillance systems were no longer working.  JA 1410-11.  Mr. Goodman was sure he discussed the alarm system proposal with the defendant.  JA 1411.  In representing the defendant and Adcor, Mr. Goodman was always available and responsive to any questions or concerns raised during the claims process.  JA 1412-13.  In fact, the first phone call the defendant made after arriving at Adcor post-fire at approximately 4:12 a.m. on July 29, 2015, was to Mr. Goodman, and Mr. Goodman turned around an email by 4:48 a.m. to personnel at GGGs assigning tasks.  JA 1397-98, 2082, 3038.

Mr. Goodman in turn forwarded that email, with the estimates from Strat Security, on September 16, 2015 to Mr. Cameron who worked for Atlantic Estimating, LLC, the building estimator retained by the GGGs; both Atlantic Estimating and the GGGs were owned by the parent company, Molecular Holdings.  JA 1392, 1476.  As a sub-contractor for the GGGs, Mr. Cameron was responsive to requests and questions of Mr. Goodman as well as the client, Adcor.  JA 1480-83.  From the use of the phrase "direct replacements," the representation being made was that the current system was not working and the replacements were exactly equivalent to what needed to be replaced.  JA 1485, 1486, 3050-54.  On October 22, 2015, the Strat Security bid was utilized to request over $30,000 for replacement of the alarm and video surveillance system to Travelers as part of the building repair estimate.  JA 1489-90, 3147, 3170, 3182-85.

After the claim was submitted, Travelers Insurance had questions about the alarm and video surveillance system bids, and sent an email on November 24, 2015, attaching a letter stating so, and specifically noted that they would be returning to Adcor to analyze "the proposed security system in comparison to the existing system"; the date set for that inspection was December 15, 2015.  JA 1429, 1490-91, 3194-95.

Travelers Insurance doubts about the $30,000 security and surveillance system bids was well founded because in truth, both systems were still working after the fire.  In fact, both the alarm system and the video surveillance system were still installed and working at Adcor in April 2019, when a search warrant was executed by ATF at the premises.[15]  JA 1140.

The true costs for the alarm and security system were substantially less.  The alarm panel had been removed at the request of Travelers Insurance, and the alarm company, Protection One, billed Adcor $216.24 for its replacement.  JA 268, 722.  In addition, two of the video cameras were damaged during the clean-up/restoration following the fire, at a cost of approximately $800.  JA 266, 291, 1375.  The total cost to replace the alarm panel and to replace the two cameras damaged during clean-up was between $1000 and $1500.  JA 291, 1375, 3201.  The quotes Hyatt obtained from Strat Security, which were submitted to Travelers by the Defendant's agent, sought over $30,000 to completely replace, upgrade, and integrate both systems.  JA 1366-1370, 1372-1376, 3004-3006, 3182-3185, 3201.

After the district court delivered jury instructions, the jury began deliberations on the afternoon of October 23, 2019.  The jury continued deliberating on October 24, 2019, and then resumed on October 28, 2019, and shortly thereafter returned verdicts of guilty as to all counts.

---

[15] During that search on April 3, 2019, ATF agents located a quote for an upgrade to the alarm system from Hartford Alarm Company dated March 17, 2016.  JA 413.

## ARGUMENT

### A.  Legal Standard.

A motion filed under 28 U.S.C. § 2255 allows a prisoner in federal custody to challenge the legality of a federal sentence on four grounds: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction; (3) the sentence exceeded the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack.  *See* 28 U.S.C. § 2255(a).  Relief under § 2255 is therefore designed to remedy fundamental constitutional, jurisdictional, or other errors, and is reserved for situations in which failure to grant relief "inherently results in a complete miscarriage of justice." *United States v. Addonizio,* 442 U.S. 178, 185 (1979) (quoting *Hill v. United States*, 386 U.S. 424, 428 (1962)).

When seeking relief under § 2255, a defendant bears the burden of proving the asserted grounds for collateral relief by a preponderance of the evidence.  *See, e.g.*, *Vanater v. Boles*, 377 F.2d 898, 900 (4th Cir. 1967)).  This is in keeping with the fundamental principal that "a final judgment commands respect." *United States v. Frady*, 456 U.S. 152, 165 (1982). The standard of review courts must apply in reviewing a § 2255 is therefore necessarily higher than would be applied on direct appeal. *Id.* at 165-66. "Once the defendant's chance to appeal has been waived or exhausted . . . we are entitled to presume he stands fairly and finally convicted . . . ." *Id.* at 164. For this reason, issues already fully litigated on direct appeal may not be raised again "under the guise of a collateral attack." *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976).

Furthermore, "claims not raised on direct appeal may not be raised on collateral review unless the [defendant] shows cause and prejudice" or actual innocence.  *Massaro v. United States*, 538 U.S. 500, 504 (2003).  "The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999).  Further, "[i]n order to

demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a movant must show actual innocence by clear and convincing evidence." *Id.* "Typically, to establish actual innocence, a petitioner must demonstrate actual factual innocence of the offense of conviction, *i.e.*, that petitioner did not commit the crime of which he was convicted; this standard is not satisfied by a showing that a petitioner is legally, but not factually, innocent." *Id.* at 494.

"New evidence may consist of exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence. The new evidence must be evaluated with any other admissible evidence of guilt.  The new evidence must do more than undermine the finding of guilt; it must affirmatively demonstrate innocence." *Webb-El v. Stewart*, No. PWG-13-2785, 2014 WL 4662609, at *6 (D. Md. Sept. 16, 2014).  The movant must show that "it is more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

As for allegations of ineffective assistance of counsel, the question is whether the conduct of a defendant's counsel fell "within the range of competence normally demanded of attorneys in criminal cases." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In *Strickland*, the Supreme Court instructed that claims of ineffective assistance of counsel are decided by the following two-prong test:  "First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  In other words, the criminal defendant must show that "his counsel's performance 'fell below an objective standard of reasonableness' measured by 'prevailing professional norms[.]'" *Christian v. Ballard*, 792 F.3d 427, 443–44 (4th Cir. 2015) (quoting *Strickland*, 466 U.S. at 687, 688).  Counsel's performance is evaluated from counsel's perspective at the time and is presumed to "fall[] within the wide range

of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

On appeal, the defendant focused on the same two issues he raised in his post-trial motions before this Court – the denial of his Rule 29 motion and the willful blindness instruction.  Here, most of his claims allege errors that could have been raised on appeal but were not (including 8 separate claims of prosecutorial misconduct).  Those claims that do not raise the issue of ineffective assistance are procedurally defaulted, and the defendant has not made any credible showing of actual innocence that could overcome this default.  Consequently, the defendant cannot raise these defaulted claims in the instant motion, and those defaulted claims should be rejected.  As for the defendant's ineffective assistance of counsel claims, each is meritless.  The defendant's claims are discussed below.

### B.  The Defendant's Motion

In the Motion, the defendant alleges 17 "grounds" for relief, all of which simply repackage the same arguments he has made repeatedly, and of which have been rejected each time.  Yet according to the defendant, "None of the [the 17 grounds] were raised at trial, on direct appeal, or post- conviction, petition, or application."  Def. Memo, at 33.  As demonstrated below, the defendant's factual arguments in the Motion have been raised (and rejected) repeatedly, and represent the defendant's alternative version of how he had *hoped* the jury and courts would view the evidence.

In the defendant's Rule 29 motion filed before the closing arguments (ECF 206), the defendant made the same arguments he makes here regarding the taping of the door (pp. 3-4), and the wire fraud charges relating to the security system (pp 6-10).  Similarly, in the defendant's post-

verdict Motion for Judgment of Acquittal Under Rule 29 and for New Trial Under Rule 33, (ECF 229), he again argued the relevance of the taping of the front door (pp. 6-9), the lack of video surveillance at the front door (pp. 8-9), evidence of deleted video (pp. 10-11), motive (pp. 11-14), wire fraud relating to the alarm system (pp. 14-20), the willful blindness instruction (p. 20), and improper argument about missing hard drives (p. 21).  The defendant raised all of these same issues yet again in his reply (ECF 233): tape on the door (pp. 2, 7-8); video footage (pp. 3, 10-11); missing hard drives (p. 11, 19); wire fraud relating to the surveillance system (pp. 13-15); the willful blindness instruction (p. 16).

In what the Fourth Circuit described as "a thorough and carefully reasoned opinion," this Court dispatched with all of the defendant's arguments in 22-page memorandum denying the defendant's motion of judgment of acquittal and a new trial, finding that the evidence was sufficient to support his convictions and holding that the jury had been properly instructed.  ECF 247.

On appeal to the 4th Circuit, the defendant's 66-page Opening Brief and 38-page Reply Brief made all of the same factual arguments above, arguing insufficiency of the evidence in the context of "equipoise"/circumstantial case, and arguing that willful blindness instruction was improper and should result in a new trial.  The Fourth Circuit affirmed the convictions and this Court's "comprehensive and well-reasoned opinion."  *United States v. Stavrakis*, No. 20-4149, 2022 WL 563242, at *4 (4th Cir. Feb. 24, 2022), *cert. denied*, 143 S. Ct. 309, 214 L. Ed. 2d 136 (2022).

The 4th Circuit included a lengthy recitation of the facts, and determined that the evidence of the defendant's guilt was "substantial," and that the government had presented a "compelling case."  *Id*. at 4, 5.  Regarding the defendant's arguments relating to alternative facts and inferences, including issues relating to the taping of the door, missing surveillance video, and missing hard

drives, the Fourth Circuit held that there was "compelling" evidence before the jury to find that

the defendant knowingly participated in the arson beyond a reasonable doubt:

> It may be that a jury reasonably could have credited that defense evidence.  But this jury did not, and the fact that evidence is "susceptible to alternative interpretations" does not make it insufficient.  *See Osborne*, 514 F.3d at 387.  As the district court well understood, "resolutions of conflicts in the evidence . . . are within the sole province of the jury and are not susceptible to judicial review."  *Stavrakis*, 2020 WL 607036, at *3 (quoting *United States v. Louthian*, 756 F.3d 295, 303 (4th Cir. 2014)).

*Id*. at 14.  The Court continued, specifically addressing the defendants' argument that there were

other possible suspects and other possible points of entry:

> Stavrakis also continues to press the possibility that the fire was set by some other suspect using some alternative means of entry.  Circumstantial evidence, however, may be sufficient to support a guilty verdict even if it does not "exclude every reasonable hypothesis consistent with innocence."  *See Jackson*, 863 F.2d at 1173; *Stavrakis*, 2020 WL 607036, at *2 (same). And here, as the district court painstakingly recounted, Stavrakis's alternative theories had little if any evidentiary support.  *See Stavrakis*, 2020 WL 607036, at *10. Such "wildly speculative" theories, id., do not undermine a jury verdict.

*Id*.

Regarding the defendant's claims that the willful blindness instruction was inappropriate

and that the evidence did not support a conviction for wire fraud relating to the replacement of the

security system, the 4th Circuit summarized the defendant's claim, which is the same argument he

makes in the Motion at grounds 10, 11 and 12:

> Stavrakis also maintains his separate challenge to his conviction on Count Three for wire fraud in connection with the $30,000 security system claim. As before the district court, he emphasizes that he did not himself submit the bid, instead delegating the matter to employee Hyatt, and argues that the government failed to prove his knowing and intentional participation in any scheme to defraud. But as the district court held, while "[t]he jury certainly could have reached that conclusion, as vigorously urged by the defense," it also had before it sufficient evidence to support its contrary verdict: that Stavrakis was aware of and intentionally involved in the submission of an inflated $30,000 claim. *Stavrakis*, 2020 WL 607036, at *11 (describing evidence showing, *inter alia*, that Stavrakis was aware of the damage to Adcor's premises from the fire, directed solicitation of

a bid for a full security system upgrade, met personally with a representative of a company submitting a bid, and was copied on an email transmitting the bid).

Considering the issue preserved for appeal, the Fourth Circuit evaluated the claim under an abuse of discretion standard (as opposed to plain error), and found that there was no error:

> [w]here the "evidence indicates that [a defendant] purposely closed his eyes to avoid knowing what was taking place around him," then a willful blindness instruction properly allows the jury to impute the element of knowledge. *United States v. Ruhe*, 191 F.3d 376, 384 (4th Cir. 1999) (internal quotation marks omitted).

> Here, as the district court concluded, a willful blindness instruction was "generated by the evidence" that the government marshalled for Count Three. *Stavrakis*, 2020 WL 607036, at *11 n.12. As in *Mir*, the record allows for a reasonable inference that if Stavrakis did not have actual knowledge of the submission of a fraudulent $30,000 claim, it was only because he "attempt[ed] to shift the blame . . . onto his employees," first directing Hyatt to obtain a bid for a full replacement system and then taking steps to insulate himself from the ensuing process – including, he suggests, by failing to open and read Hyatt's email regarding the bid. *See* 525 F.3d at 358–59 (finding willful blindness instruction appropriate where employer claimed unawareness of any criminal activity by employees); *Stavrakis*, 2020 WL 607036, at *11. That is the "type of situation for which a willful blindness instruction [i]s intended," we held in *Mir*, 525 F.3d at 359, and the district court did not abuse its discretion in giving the instruction here.

*Id.* at 7.

The defendant made the same arguments again, first in his petition for a rehearing and rehearing *en banc* (denied on April 5, 2022 without a single judge requesting a poll, ECF 397), and in his petition for certiorari to the Supreme Court (certiorari summarily denied on October 11, 2022 after the Solicitor General waived briefing). The argument has been squarely rejected. Thus, the defendant's grounds 10, 11, and 12, all relating to willful blindness and allegation of ineffective assistance of trial and appellate counsel, are without merit and should be denied.

Moreover, the defendant made all of these factual arguments to the jury, through cross-examination of government witnesses, direct examination, and during closing argument, as described below:

- Ground 3, relating to Special Agent McKinnies testimony that he did not observe an exterior handle on the roof hatch:  JA 2205 (defendant's closing argument);

- Ground 4, relating to Firefighter Cianferano's testimony: ECF 293, pp 160-177 (cross-examination); JA 2216, 2236-38 (defendant's closing argument);

- Ground 5, relating to the defendant's argument that a government's exhibits showed the tape on the ground:  JA 2261 (defendant's closing argument);

- Ground 6, relating to Detective Reno's observations of video surveillance:  ECF 300, at 156-66 (cross examination);

- Grounds 8 & 9, relating to the Adcor hard drives and the defendant's complaint that trial counsel should have called an expert in digital forensics:  ECF 304, at 168-180 (direct examination of defense expert Blazer Catzen); JA 2233 (defendant's closing argument);

Similarly, the defendant's claim that grounds 5 and 8 constitute "newly discovered evidence" of "actual innocence" are specious.  In ground 5, the defendant's claim that a government's exhibit shows the tape used by the defendant laying on the ground in one of the ATF photographs was argued by defense counsel during closing argument, with little impact.  The government's interpretation of ground 8 is that it relates to whether the hard drives at Adcor failed, or not.  As to the "new" evidence for ground 8, the defendant merely cites to various portions of the trial testimony, defense arguments, and government exhibits.  Furthermore, the defendant *did* hire a digital forensic expert, Blazer Catzen, whose testimony related primarily to the Adcor hard drives.  ECF 300, at 156-66.

As demonstrated above, the defendant's claims, regardless of his repackaging them as prosecutorial misconduct, ineffective assistance, or newly discovered evidence, are not new, and have all been previously made and rejected.

### C. No Misconduct Occurred, Although Claims of Prosecutorial Misconduct Should Be Raised on Appeal, are Not Appropriate for § 2255 Proceedings, are Therefore Barred

In grounds 1, 3, 4, 6, 7, 13, 14, and 15, the defendant attempts to repackage his alternative factual theories as prosecutorial misconduct, by alleging that various questions and arguments made by the AUSA's were "misleading," "lies," or unsupported by the evidence. Each and every issue was disputed at trial during cross examination of the witnesses, argued to the jury by defense counsel, raised during the Rule 29 motions, and raised again on appeal – as part of the defendant's alternative factual theories of the evidence. Each, in turn, was rejected – by the jury, by this Court, and by the Fourth Circuit.

As an initial matter, the defendant's claims of prosecutorial misconduct, as with all of his claims other that those alleging ineffective assistance of counsel, are procedurally defaulted. Claims of prosecutorial misconduct must be raised on direct appeal following a jury conviction, were not, and are therefore procedurally defaulted. *Hernandez Portillo v. United States*, No. 1:07-CR-00081-GBL, 2014 WL 3615815, at *1 (E.D. Va. July 17, 2014); *Fuller v. United States*, No. 4:13CR72, 2018 WL 3398129, at *3 (E.D. Va. July 11, 2018); *Reese v. United States*, No. 1:15-CR-32, 2017 WL 2623770, at *4 (E.D. Va. June 16, 2017).

Even if the Court were to examine the defendant's claims, they are patently baseless and should be denied. Reversible prosecutorial misconduct generally has two components: that '(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.' *United States v. Chorman*, 910 F.2d 102, 113 (4th Cir. 1990). In evaluating whether a prosecutor's remarks were sufficiently prejudicial to warrant reversal, the Fourth Circuit has noted a number of relevant factors, namely: (1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant; (2) whether

the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury.  *United States v. Scheetz*, 293 F.3d 175, 185–86 (4th Cir. 2002).

Here, the defendant's complaints amount to nothing more than his hopes that the jury had seen the evidence differently.  His allegations of prosecutors' "lies" and "misleading" questioning are simply the defendant again pointing to alternative theories and witness inconsistencies, matters already resolved by the jury, this Court, and the Fourth Circuit.  Furthermore, none of the alleged instances of misconduct alleged in the Motion could have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.[16]

As to the defendant's claim in ground 15 that the AUSA "insinuated that there was something sinister related to drug trafficking going on at Adcor," the government believes the reference in the transcript to "drug" is an error, and that the AUSA said "drum."  The trial transcript is replete with references to the methanol *drum*, and the "five gallon *drum* of methanol."  In fact, in the 4046 pages of the Joint Appendix, this is the only mention of "methanol drug."  Additionally, Bud Kurhman clearly testified that the methanol at Adcor could be referred to as "MEK," or "MEK," and that was "not the meth like the drugs."  JA 1291.  Therefore, it is the government's position that the AUSA actually said "drum" and not "drug."  However, even if the

---

[16] In ground 7, the defendant attempts to grammatically dissect an innocuous series of questions from the AUSA to argue an intentional inference that the defendant previously set a fire at Adcor.  The proper line of questioning was not objected to, nor was it raised on appeal.  In an attempt to show the jury's malicious interpretation, the defendant points to a jury note that inquired as to whether the defendant had any prior arsons and insurance claims.  Def. Motion, at 15.  A fair reading of that question is that the jury did *not* receive evidence of additional arsons – because if they did that question would be nonsensical.  Regardless, after consulting with counsel, the Court instructed the jury:  "Members of the jury, you may only consider and decide the case based on the evidence presented and not on the basis of anything else."  ECF 306, at 125.  Thus, there was no prejudice in any event.

AUSA actually misspoke and said "drug," it was clear from the context of the question, the answer that followed, and all of the references to the "drum" of methanol/MEK that preceded and followed that the possible lone malapropism was actually intended as a reference to the "drum" of methanol. Methanol is a cleaning agent, and not a drug, which further underscores the nonsensical nature of the claim raised by the defendant. The Court will recall Mr. Kuhrman's testimony where he described, in a fair amount of detail, that he used the drum of methanol or MEK to clean a specific part for an Adcor customer. There was no misconduct, no sinister intent, and clearly no prejudice suffered by the defendant, so the claim must be denied.

### D. The Defendant's Claims Relating to Ineffective Assistance of Counsel are Meritless.

To the extent that the defendant alleges that his trial counsel was ineffective for failing to object to any of the alleged AUSA misconduct, the defendant has not and cannot establish deficient performance or prejudice, and his claim fails. As to the defendant's claim in ground 16 that his defense counsel's closing argument was ineffective because of his use of the phrase "otherwise law abiding citizen," the argument is without logic or merit. Nothing about defense counsel's representation of the defendant, including closing argument, could have been interpreted by the jury, or anyone else, as an admission of guilt. This claim should be denied.

### E. The Jury Instructions Were Proper, and in any Event are Procedurally Defaulted.

Finally, the defendant badly alleges in ground 16 that this Court "failed to instruct on the definition of specific intent" relating to Counts Two and Three. The defendant does not provide the text of the instruction that he claims should have been given, but was not. In any event, allegations of errors in jury instructions could have been raised on appeal, as was the willful blindness instruction. Here, the defendant's allegation of a missing specific intent instruction was not raised on appeal  Thus, the defendant is procedurally barred from raising this error in this proceeding. Additionally, the record reflects that the jury was accurately instructed regarding

intent (JA 2328-29) as well as on the elements of Counts Two and Three (JA 2330-39), including: "The second element, speaking now of Counts Two and Three, wire fraud, the second element that the government must prove beyond a reasonable doubt is that the defendant participated in the scheme to defraud knowingly, willfully, and with specific intent to defraud.  I have already defined those terms for you and those definitions apply here with equal force."  JA 2335.  Thus, the defendant cannot establish deficient performance or prejudice, and his claim fails.

## CONCLUSION

For the reasons set forth above, the United States respectfully submits that this Court should deny the defendant's *pro se* Motion to Vacate pursuant to 28 U.S.C. § 2255.  Moreover, no hearing is necessary because "the motion and the files and the records … conclusively show that the prisoner is entitled to no relief." *United States v. Lemaster*, 403 F.3d 216, 220–23 (4th Cir. 2005).

Nor should the Court issue a certificate of appealability.  Rule 11(a) of the Rules Governing § 2255 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 474 (2000); *Miller-El v. Cockrell*, 537 U.S. 322, 322 (2003).  A prisoner satisfies this standard by "demonstrat[ing] that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong," and that any dispositive procedural ruling by the district court is likewise debatable. *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484).  The defendant falls far short of this burden and thus no certificate of appealability should issue.

Respectfully Submitted,

Erek L. Barron
United State Attorney

By:

Paul E. Budlow
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 16, 2024, a copy of the foregoing Response will be sent by first class mail to:

> Demetrios Stavrakis, pro se
> Fed. Reg. No. 64658-037
> FCI Loretto
> P.O. Box 1000
> Cresson, PA 16630

Paul E. Budlow
Assistant United States Attorney